Good afternoon.As you can see, we have with us Judge Aldersert by video conference, and I understand if the video has a sound problem, there's an audio backup, so we should be fine. But I would ask all who come to the podium to be sure to speak into the microphone so that Judge Aldersert can hear you clearly. I'll announce the first case of four... Good morning, my colleagues. Can you hear me all right? We can hear you fine, Ruggie. Thank you very much, sir. Good afternoon to you, sir. Life's tough in Santa Barbara. I'll bet it's... What's the temperature out there today? I think it's pretty cool. It's going to be about 73. Life is tough. The first case is Sinker Management Consultant, Sink, et al. versus Milgram, number 09-2238. Garvin and Mr. Kosiar. Thank you, Your Honors. May it please the Court, William Sharon from Pryor Cashman, together with Jeff Schreiber from Meister Seelig & Fine for the appellant, Live Gold Operations, Inc. I've asked that three minutes be reserved for my rebuttal. Okay. That's granted. Judge Ambrose, I have a problem with the video because I can't see the counsel. I just see his back. Normally there is another camera in the courtroom that centers on the reading desk and the counsel. Have they fixed that? Let's take a look here. Okay. Thank you, Patrick. We'll restart your time. You don't have to worry about that. Okay. That's better. Much better. Great. Thank you very much. And, Patrick, restart this time. All right. I have your mechanics fixed. I can only see Judge Ambrose. I cannot see... Now, we can't see you, Ruggie, but anytime you have a question, just jump in and we'll back off. All right. Thank you. All right. We'll start. Okay. Thank you, Your Honors. I'm here today because, really, there's just something wrong with the notion that a State Attorney General can target and harass somebody's livelihood and then abandon the fray, in the words of the U.S. Supreme Court in the Buckhannon decision, at the last minute, because it's obvious that a Federal court is going to reject the reasons for her conduct and is going to make her stop. And that is precisely what happened in this case. Had the Attorney General actually instructed, or maybe I shouldn't say instructed, had actually warned the Hilton not to print tickets that... Yes, Your Honor. What they had done, if Your Honor turns to the record, I could point out two places. The first would be at page A280, which is a copy of the altered ticket that was used. And the Court can see at the top, it doesn't refer to the client's singing groups by their proper names. It refers to them as a tribute to drifters, coasters, platters. That was an alteration made at what was called the request of the Attorney General's office. If Your Honor has also turned to page A185, which is the TRO hearing transcript, the Deputy Attorney General, arguing at the time Ms. Rack, at page 11, line 15, addressing Judge Debevoise said, Your Honor, our simple request to the Hilton was that if they wanted to continue with the advertisement of the concert, that the concert be promoted as a tribute or a salute, and that is certainly within the realm of the Truth in Music Act. So they were very open at the TRO hearing that they had come in. They were the ones that requested this. And although they called it a simple request, the relief that they received is the ultimate relief under the Truth in Music Act, at least as Ms. Milgram's office was construing it. You've got, I mean, certainly you have equities on your side, but you've got some significant case law that's against you, both at the Supreme Court in Buchanan and in our court in a case that Judge Roth wrote called John T. Buchanan says basically you need a judgment. You don't have a judgment. And then you look at, for example, John T., in which I think in that case there was even a preliminary injunction that was issued. Here we just have a TRO. And the Court said there's not enough on which to base, in light of Buchanan, an award of attorney's fees. If I can address both cases in turn. Why don't you start with Buchanan? With Buchanan. Buchanan, although it did discuss that there should be a consent decree or a judgment, it didn't address because it wasn't germane to that case the question of a preliminary injunction, something prior to judgment. Subsequent case law, including case law from this Court in PAPV last year, held that preliminary injunctions qualify. We are sort of the next step with a TRO, but I'll get to that in a minute. What the Court in Buchanan was most concerned about, and it is stated repeatedly throughout the decision, and also in Justice Scalia's concurring decision, is that they were very concerned about a defendant abandoning the fray, was the phrase that they kept using, for reasons divorced from the merits, for cost reasons, because a defendant dies, because there's some change, and the plaintiff may walk away with some form of relief that they had sought, but it's not a legal victory on the merits. But what the Court did say, repeatedly, is that the primary concern was that a defendant could abandon the fray for reasons on the merits, because there is a, quote, unquote, threat of victory by the plaintiff. That's what the Supreme Court said. So are you going to address the Ninth Circuit case on LSO versus Stroh? Isn't that case really right on all fours with the case before us now? Your Honor, I apologize. I'm not familiar with that case. It hasn't been addressed by either side. I'm familiar with the Ninth Circuit's decision at Watson, which is also very similar and which this Court relied upon in PAPV last year. I'm happy to address, Your Honors, the decision that Your Honor is pointing out, if Your Honor wouldn't mind filling me in on some of the facts, as it were. Otherwise, if I may continue to answer on the Buckhannon and John T. decision by Judge Roth. The case there involved the defendant's state agency interfering with a stage presentation. And the issue was, does a district court TRO forbidding the state from further interfering with an upcoming presentation of this stage act at the Palm Springs Convention Center? And under the purported authority of a constitutional doubtful state statute, were the state's previous threats to the convention center caused it to cancel agreement with the plaintiff to host exhibit? The court held that the TRO was sufficient because it did more than preserve the status quo. That is very similar, Your Honor, to the Second Circuit's decision this year in Garcia. Although the contrary result was reached, the same line of reasoning was applied. And I would submit and was going to discuss how it is very similar to the line of reasoning in John T. in PAPV. Basically, at the end of the day, although Judge Debevoise drew a line between the issuance of a preliminary injunction versus a TRO, without explaining why he drew that distinction, other cases. But even if you were right, John T., there was a preliminary injunction entered as we talked about. That's correct, Your Honor. And what John T. was addressing was shortly before that decision in a case called J.O. County, a case arising under the Individuals with Disabilities Act as the John T. case was. John T. is not limited only to the IDEA. Correct. But the reasoning on the prevailing party fee issue was linked to the J.O. decision, and basically that under the IDEA, an injunction or what is referred to as a stay-put order under that statute is automatic. Whenever there is an action brought, then there is automatic relief that the special needs individual is entitled to continue to receive those special needs through the proceedings. That is not granted on the basis of a determination of merits. That is granted as a matter of course. John T. addressed the same issue and said that even though it was a preliminary injunction in that case, it was the same relief. The court ordered that the special needs student receive his special services in the school that he was accustomed to receiving them in. And that was required to be done, but it wasn't a merits-based determination. By contrast, in PAPV, for instance, there was a preliminary injunction that was merits-based. In that case, it was a First Amendment issue. And even though, of course, no TRO or preliminary injunction. If there isn't one way to look at PAPV is that it was a case where the defendants got very cute, saw they were going to lose, had a preliminary injunction entered against them, and before they could get to the merits, they had legislation passed, not for their side, but actually gave the plaintiffs all that they would have wanted. And the court said, well, at that point, you messed around. You were too cute. It's too late. Not exactly, Your Honor. What happened there was there was a challenged ordinance, and the plaintiffs sued. The city first came in and said, we're not enforcing that ordinance, so we don't have to go through the trouble of a lawsuit. And the court said, well, that may be, but it's still on the books. You haven't repealed it. So the court, on the merits, entered a TRO. They came back for the preliminary injunction hearing, and the city said, look, we've made some proposed amendments to the statute. The judge took a look at it, gave a quote, unquote, clear signal to the city that there were still constitutional problems, didn't touch the TRO in terms of its mandate, its language, simply converted it as is through preliminary injunction, and said, you still haven't taken this off the books, and your proposed amendments aren't good enough. They then came back again, and the city moved to dismiss on moteness grounds, just like Ms. Milgram did in this case. And the district court had to deny that challenge. Yeah, but the difference, it seemed, that in PAPV is, for example, looking back at the John T case, they said all John T that happened there, even though there was a preliminary injunction entered, was that the status quo was preserved. If it's just the status quo was preserved, you don't get, you haven't won on the merits yet. In that particular case, they perceived that the, what happened was the preliminary injunction actually altered the legal relationship among the parties. And here, how can you say that the legal relationship was altered prior to the time of that final hearing? Your Honor, first of all, I would address it in two ways. First would be the entry of the TRO. The TRO was an extended TRO. The TRO was an extended TRO, and it was purposely, as Judge Debevoise commented at the close of the preliminary injunction hearing, it was specifically addressed to run through the entire show at the Hilton Hotel in Atlantic City, which took it into three weeks, not just ten days. So it was specifically addressed. So basically we're going to get this one behind us, and then we're going to deal with the merits. Well, yes. And that's what Judge Debevoise said. Well, what he said, first he said that in addressing the merits and hearing from Ms. Milgram's office on the merits, disagreed with what she said. She made her arguments. She had noticed. She showed up. She was prepared, and she made her arguments. It was the exact same argument she'd been making to us for weeks in advance. So it wasn't any sort of a surprise. Judge Debevoise heard all of that and said, I think you're wrong. At one point he said, I think you're truly wrong. And then later he said, I have a very serious problem with what you're advocating. And then he said, I find a likelihood of success on the merits and that there might be substantial federal rights being impaired. Then he basically granted permanent relief. The likelihood of success on the merits doesn't mean that it's greater than 50%. It means there's a good chance that you're going to win as one of the four problems. Same as a preliminary injunction standard, and as I started to say a couple minutes ago, no preliminary injunction or temporary restraining order will ever finally resolve something on the merits unless it becomes the last word in the case. And in this case, that's exactly what happened. Because the TRO not only granted permanent relief. In fact, when we came back for the preliminary injunction hearing, Ms. Milgram argued that the case was now moot because we'd received all the relief that we really needed. The Hilton show, she was arguing that her conduct was not capable of repetition. Judge Debevoise properly disagreed with that. But she came in and said, you've got all the relief you're entitled to. This is moot. And then the discussion turned on whether there was a registered or a common law. When Judge Debevoise said at the PI hearing we'll get to the merits, do we know what he was referring to? Yes. He said that at the TRO hearing. And then I remember it quite clearly because when I first stood up, he looked at me and said, I believe Ms. Milgram may be on stronger ground on the merits, which was a surprise to me except he didn't mean anything having to do with the constitutional issues. He never changed his mind on those. What Judge Debevoise was referring to was the fact that as a more basic principle of contract and property law, our clients have rights, trademark rights, by virtue of assignments and agreements and transfers and licenses. And initially there was another plaintiff and appellant in this case named Singer Management. Judge Debevoise in another action was in the process of holding Singer Management in contempt of court. And Judge Aldersert recently affirmed that decision in July. The drifters matter, right? The drifters matter, exactly. And what Judge Debevoise was saying to me when he was talking about the merits and was saying in general was that doesn't this case go away because Singer Management doesn't have the rights as a contract matter to the drifters. And once I explained to Judge Debevoise that even if that takes care of Singer Management, and it did and they're no longer in this appeal, it doesn't address Live Gold. Live Gold's rights are separate, independent. They've never really been challenged. We've given the Attorney General's Office everything. For years they've had it. They've never made it a challenge. So on the basis of whether you have a common law license, on those merits you say you do. Yes, on those merits we say we do, and that's never been challenged. And I see my time has expired, but if I may just complete the thought. Once Judge Debevoise appreciated that, he immediately turned right back to the Attorney General's Office and said, why aren't their unregistered trademarks the same validity as a registered trademark? That's a conflict with the Lanham Act. All the same points that had been discussed at the TRO hearing. He never moved off of it. She was never able to move him off of it. He said, quote, unquote, well, I failed to see it in response to her arguments. Although she's come into this court and later in the prevailing party fee hearing before Judge Debevoise, claiming that she had argued inadvertently and that this was just hypothetical colloquy, that cannot really be taken seriously. But isn't, just to conclude this portion here. Yes. Isn't the big problem that you have is that you had a judge and you're saying that this judge had somehow altered a legal relationship, had ruled in effect for you on the merits at the TRO stage, the extended TRO that was given. And yet this is the very judge who later on said, I hadn't reached the merits. Based on the case law, you don't get it. So we know exactly what's in his mind. Well, what he, in his order at page A8 of the record, he addresses and says in opposition the state maintained that he went through the unregistered. At the hearing, however, the state indicated that the sentence in its brief regarding the interpretation of the act was inadvertently put into the brief. And with all due respect to Judge Debevoise, he asked the Deputy Attorney General four times at that hearing, why are you distinguishing between unregistered and registered trademarks? He asked some tough questions and he ruled against her on preliminary matters, but he is the one who's saying that I did not rule on the merits, I did not give a ruling that in any way altered legal relationships prior to the ‑‑ On the merits of the license or on the merits of the reasons for the TRO? I think we just heard why he said we will get to the merits of the license later. Exactly. And that's why we're here. To the extent there's any question, we're here because we believe Judge Debevoise got it wrong and misinterpreted PAPV, misinterpreted what was ‑‑ May I interrupt? I want to get back to the first question that my colleague Judge Ambrose asked you. Going back to Buchanan, I want you to tell us where is the judicial imprimatur language on which you are hanging your hat in this appeal? In this case, Your Honor, it exists primarily in the hearing transcripts at the TRO and at the preliminary injunction stages. At the TRO stage, as I said before, he said that he had a very serious problem with the state's position and he found substantial federal rights may be impaired. At the preliminary injunction hearing, after he had a choice, he could either convert the TRO to a PI or he could do what he did, which is bind her in court and judicially estop her, basically giving us the same relief except instead of ‑‑ Did the TRO change any relationship between the State Attorney General and the Hilton Hotel? Yes, the State Attorney General was required to stand down and the Hilton Hotel was given what was called a safe harbor period to go back to its former advertising. Isn't that then the judicial imprimatur language? In the TRO, I believe it is at the preliminary injunction when he then went further and found basic legal problems with the Attorney General's position, due process, equal protection, First Amendment and conflict with the Lanham Act, all the exact arguments we had made, he found that those existed, but then said they've been resolved in our favor because he bound her to our position. Thank you. Thank you very much. Would you back on rebuttal, Mr. Kosiar? Good afternoon. May it please the Court, Jeffrey Kosiar, Deputy Attorney General, representing Apelli and Milgram, Attorney General. Could you just put the mic up just a tad? Thank you. Is that better? Jeffrey Kosiar, Deputy Attorney General, representing Apelli and Milgram, Attorney General of the State of New Jersey. This is about as close as you can get to having a ruling against you. But starting off at the beginning, what made Ms. Rack think that there was something that she could call the hotel and have the hotel, in effect, pull the advertising for this performance at the outset? Judge Amber, I think it's important to place the initial stage of this investigation in the proper context. The Truth in Music Act was enacted in May of 2007. It had never been previously interpreted. We had never initiated any enforcement action. It appeared, from what I can see on the record, that there were a lot of questions that were running around the Attorney General's offices. Does it apply? Doesn't it apply? And basically, she took action to stop these performances from taking place without really being sure that she was right on the law. Judge Amber, the State did not go to court and try to stop these performances. But they did go to the Hilton Hotel, right? We did issue a subpoena, Your Honor. Yeah, and did you issue any instructions to the Hilton Hotel on how they ought to entitle this conference,  We did not, Your Honor. Your Honor, what happened was in response to the subpoena, in lieu of producing documents, which is what we had requested, the Hilton came to us, and this was verbally, and asked, what do we need to do to avoid any problems? And in response, we said, if you want to be very safe and ensure it is not an issue, you can bill this concert as a tribute, and that would be protected. How did this matter first come to the attention of the AG's office? It first came to the attention because of the litigation in Marshack v. Treadwell, which the State became aware of, regarding the rights of singer management to use the trademark Ellsbury Hobbs Drifters. Based on that ruling and based on the information concerning this concert, we thought that was a Well, okay, even there, there's three groups. I mean, it might have been the drifters, but not the coasters or the platters, and yet everybody was put in one fell swoop. You weren't quite sure what the statute was, and yet you're telling the hotel, you know, you probably ought to not do anything here. You ought to pull the advertising, which really hurts the people coming to the concerts. Don't you need a lot more to go on? Your Honor, with respect to the other groups, all three of these groups, there has been protracted litigation concerning the underlying rights of these names, and based on that history, we thought it was certainly understandable to try to clarify their rights under the law, given that this is a new law. This was a good opportunity to see if they did in fact have rights, and I think it's important to point out that before the Well, you say to see if they did have rights, and I gather from the Attorney General's position that you did not have rights if you just had a common law license as opposed to a registered license. Is that to see if they did have rights determination you wanted to make, or is it to see if having a claim to a common law license, they could in fact prove that position? The State was trying to ascertain whether any of these groups had legitimate rights, whether it be registered trademarks or unregistered trademarks, under the law. We didn't know, and I think it's important, like I said So if you don't know, why play hardball with them? I mean, you're opposing the TRO. Why not go to the TRO hearing and say, look, let's enter it for 10 days. We're going to try to sort some facts out. Instead, you come in and you're saying, we don't want a TRO entered at all. We don't want anything done, and Ms. Rack played very strongly her position, which turns out to have been a weak position. Well, Your Honor, I think it's important to remember that on August 15, 2007, which is a day before the lawsuit was filed. And parenthetically, they had also, information that you had requested, they had been trying to give you, you know, as fast as they possibly could. Your Honor, I have to disagree with that because the record reflects that, again, on August 15, 2007, plaintiffs or appellant produced the documents supposedly proving their rights to these names. In less than 24 hours, they filed a lawsuit. So I would state that they did not make a good faith effort. They were desperate at this point. I mean, they had, what, 48 hours to go? Your Honor, we had requested that. A few hours to go by the 14th or so. Your Honor, we had requested a documentation, a written documentation on August 9th, and they waited until the day before they filed their lawsuit to produce it. So I would challenge. But as I remember the record, they thought that that would satisfy Ms. Rack, and it didn't, for some reason. I'm not sure why. At that point, did they really have any choice other than to go to court as quickly as they could? Your Honor, I think that the, just to return to the original argument that the State has made, is that we never went to court to stop these concerts, and there is no, the appellant has failed to. At the TRO hearing, did you oppose the TRO? We did oppose the TRO, Your Honor. So if the TRO wasn't entered, what would you have done? That's in effect, the concerts wouldn't have gone forward on the 17th, would they, or 16th, whenever it was. Well, they would have apparently gone forward as a tribute concert. That was my understanding. But that has considerable impact on the potential income to a group, to agents such as the plaintiffs, right? Well, again, I would just point out that that was the State. Right or wrong? Certainly conceivably, that's true, Your Honor. In interpreting subsection E of the Truth in Music Act, the performance or production is expressly authorized by the recording group. Now, if the, if Live Gold has a license for the copyright, a registered license, you would say that that satisfies expressly authorized. A registered trademark, Your Honor? Yeah. I believe that would be A, that they would qualify under A. But I'm talking about E, and I'm talking about the language expressly authorized by the recording group. If Live Gold has a registered license, I mean, that's absolutely no problem. Correct, Your Honor. How about if they have a common law license? Well, I believe, Your Honor, that's if they just had a common law license, would they have been expressly authorized? I believe, based on the position the State has taken, that they would be authorized. That they would be. Yes. But when you first went in to oppose the TRO, was it not your position that they would not be authorized? Well, I would concede that some of the State's initial interpretations of this new act were not as clear as they could. Okay. And that at the beginning of the TRO, at the TRO hearing, it was your position that with a common law license, they were not expressly authorized. I did not argue at the TRO hearing. I'm not sure. Have you read? I certainly have read the transcript. Yeah. And isn't that correct? Isn't what I'm saying correct? I believe that at that time the State did have questions about that issue, about whether or how that would fit into the statute. But isn't that what this whole dispute is about? No, Your Honor, I think Isn't that what Judge Debevoise told the Attorney General, that you have now switched your position and you've got to stay switched? Well, Your Honor, I think Judge Debevoise was uniquely situated to determine whether he had made a ruling ordering You know, you seem awfully vague about what seemed to be some fairly clear transpirations in positions and change of positions at these hearings. I think I've exhausted this issue. I'll let you go on to something else. Since there's an interruption, Counsel, how do you read LSOV Stroh, the 1999 Ninth Circuit case? Your Honor, I'm not familiar with that case. All right. So here we have a case that's on all fours in this issue, and neither the appellant or appellee has found that case. And I had a law clerk two months out of law school found it. I just don't understand this. I apologize for that, Your Honor. I would just point out that an appellant has failed to identify, though, any court order supporting the merits of its constitutional claims that would entitle it to an award of prevailing party attorney's fees. All of appellants argue that in PAP, there was a preliminary injunction entered, and basically the court said, again, these were my words, that you got too cute. You basically had lost, there had been an altering of relationships, and in order to try to save the day, you got the legislature to pass something that went to the plaintiff's way, and, in effect, you had crossed the Rubicon. And why can you say here that the same thing had happened, that you had opposed the TRO, you lost, you got the extended TRO entered to allow the entire shows to take place, all of the shows, you then went back, you brought up about two or three preliminary objections to getting to the merits, the court ruled against you on all three, and then you cave. So you put people through a lot of time, energy, and money, and a lot of stress, and then at the end, you just cave. Why couldn't the court say, this is an outlier, this is the exception, this is like PAPV, and you've crossed the Rubicon? Your Honor, I think there's two important distinctions with PAPV. One is that in that case, the district court agreed that the plaintiffs were a prevailing party and awarded them attorney's fees. Here, the district court did not agree that they were a prevailing party and denied their request for attorney fees. Second, in people against police violence, the preliminary injunction declared the Pittsburgh ordinance to be unconstitutional. That didn't happen here. Well, if the Attorney General hadn't changed her position at the time of the preliminary injunction hearing, under her original interpretation, it would seem pretty evident that Judge Debevoise was about to proclaim it unconstitutional and in violation of the Lanham Act. Your Honor, even if we do accept the supposition that the state did change its position at the preliminary injunction hearing, that would still be a voluntary change, and that's the catalyst theory. Well, let's look at this, Mr. Kurzer. Don't we have a judicial resolution on the merits where the state disagreed with live gold arguments on the merits and that the court openly agrees with live gold, asks the state to agree, and then stops the state from ever asserting an interpretation to the contrary insofar as the Hilton performance was concerned? Isn't that a judicial resolution on the merits? Your Honor, I would have to disagree with that, in that the TRO did not address the merits of the constitutional claims made by appellant. But it did make the issue as to whether the performance should go on as a straight performance other than whatever that expression is tributed. I would... You know, forget about the Constitution. What happened was this was not a case of a TRO preserving the status quo. This is a TRO that changes the legal relationship between the Attorney General and the Hilton Hotel. Your Honor, I would state that the TRO, based on Judge Debevoise's own words, did not reach the merits of the constitutional arguments, and that the... Well, you keep going back to that, and I was going back to what was the real thing. I understand your position. What happened as a practical matter? Well, as a practical matter, I mean, obviously the shows did proceed. But I will... As a show, not a tribute. Correct. Advertised as the Platters, not a tribute to the Platters. Correct. And again, I would... My law clerks did say, who are these music groups we never heard of? Wait a minute, wait a minute, wait a minute. Whoa. You've heard of Searchin'? I said it's for the old folks who go to Atlantic City. Poison Ivy? Charlie Brown? Everybody remembers Charlie Brown? Am I dating myself? The great pretender. Well, I've had two cases in this court with this, with the drifters and so forth, and all I feel that I was a visitor from another planet. Only You? I mean, Only You is a great romantic song. Good stuff. No, it's not your era. Okay, I get it. Your Honor, I see my time is up. I would just repeat that we believe that the appellant's argument would fall under the catalyst theory and that there was no court order that would qualify them to an award of attorney's fees under Buchanan. Okay. Thank you. Thank you. Mr. Sharon. Sharon. Thank you. I don't have much to add on rebuttal. I would simply point out in the record at page A to O. Were the shows, was there a perception that the shows were less attended because of this? Actually, the publicity probably helped the shows, didn't it? I don't know how much publicity it actually received, and I don't know the answer to Your Honor's question. I do know that it would have been a very serious problem to Live Gold if this had continued. At page A204 is the sua sponte subpoena that the Attorney General served on the Hilton, dated August 6, 2007. At page A138 is the e-mail communication between myself and Ms. Rack on August 8, two days later, following a half-hour conversation that I had with Ms. Rack explaining all of my client's rights and where Ms. Rack had said that she found our explanations helpful and asked for documents to confirm them, which I said I would get her. And then if you keep reading the e-mail chain, you will see that a day later on August 9th, she says, even though I said I was going to send the documents, from the State's perspective, we don't have sufficient proof. We're not going to change our opinion. This was a fait accompli from their position. We did go ahead and provide those documents as soon as we had them anyway. But as Your Honor noted, the press of time compelled us at that point. There was certainly no surprise from the Attorney General's office. They knew all of this. So respectfully, we would ask that this Court reverse the ruling below and hold as a matter of law that Live Gold's status vested as a prevailing party under Section 1988B. I thank the Court. Thank you. Thank you to both counsel, and we'll take the matter under advisement and call the next case.